# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RONNIE G. WIGGINS,                    :
                                      :
      **Plaintiff**                     :
                                      :
      v.                               :   CIVIL NO. 3:11-CV-1298
                                      :
BRIAN A. BLEDSOE, et al.,             :   (Judge Munley)
                                      :
      **Defendants**                   :

## MEMORANDUM

**Background**

     Ronnie Wiggins filed this combined  Bivens[1]/Federal Tort Claims Act (FTCA) action regarding his prior confinement at the United States Penitentiary, Lewisburg, Pennsylvania (USP-Lewisburg).[2]  The Plaintiff is represented by counsel.  An Amended Complaint (Doc. 15 ) was subsequently submitted.

     A  stipulation executed by counsel for the parties which agreed that the claims against Defendants Campbell, Drees, Dunkelberger, Edinger, Fosnot, Hepner, Loss, Maiorana, Murray, Perrin, Rear, Yohe and Yost should be dismissed was approved by this Court on January 23, 2015.  See Doc. 52.

---

    [1]   Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). Bivens stands for the proposition that "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978).

    [2]  Plaintiff was last known to be confined at the United States Penitentiary, Terre Haute, Indiana.

By Order dated August 31, 2015, Plaintiff's motion to file a second amended complaint was granted and the proposed second amended complaint (Doc. 91-1) was accepted.  See Doc. 95.  Remaining Defendants responded by filing a motion to dismiss and for summary judgment.  See  Doc. 98.

Remaining Defendants, with respect to the Bivens portion of the second amended complaint, are the following USP-Lewisburg officials: Warden Brian Bledsoe; Unit Manager John Adami; Lieutenants S. Heath and Jim Fleming; as well as Correctional Officers Tim Crawford and Michael Hornberger.  The United States of America is the Defendant as to the FTCA claim.

Plaintiff has been in Bureau of Prison (BOP) custody since 1990.  Wiggins is a former affiliate of the Dirty White Boys (DWB)  gang and held a leadership position within that organization.  While confined. at the Unites States Penitentiary, Victorville, California (USP-Victorville)  in 2007, Wiggins and another inmate stabbed two members of the DWBs.  As a result of that incident, Plaintiff was targeted for retribution by the DWBs .  Specifically, DWB members had standing orders to attack and kill Wiggins in retaliation for his sole in the assault which was apparently felt to have been unwarranted.

In response to the threats against the Plaintiff, he was designated for transfer by the BOP to another federal correctional facility.  Wiggins arrived at USP-Lewisburg on May 19, 2008 and was placed in the prison's Special Management Unit (SMU).

The SMU at USP-Lewisburg was created in 2009 to house disruptive and violent prisoners.  SMU prisoners are generally kept in their cells but they receive one (1) hour of

2

daily recreation in a recreation cage. Due to their backgrounds, SMU prisoners require greater supervision.  Upon his arrival at USP-Lewisburg, Wiggins claims that he informed prison officials of his need to be separated from any prisoners who were affiliated with the DWB  gang.  As a result of his need for protection, Wiggins was afforded single cell status whenever possible.  See  Doc. 91-1, ¶ 23.

During the first fourteen (14) months of his USP-Lewisburg confinement, Plaintiff asserts that he was housed on USP-Lewisburg's G Block without incident.  Specifically, Wiggins was not assaulted by any other prisoners and was kept separated from DWB members and other white gang affiliates.  On May 18, 2009, Wiggins was transferred to B Block where he remained until July 15, 2009 again without incident.

On July 15, 2009, Plaintiff was sent to the third floor of Z Block.  It is asserted that this transfer was initiated without the usual internal documentation purportedly per a determination by Unit Manager Adami.  When advised of the planned transfer, Plaintiff states that he informed Adami and other staff that such a transfer would pose a threat to his safety as there were inmates on Z block's third floor who were DWB members including one who had recently been transferred from USP-Victorville.  Adami purportedly responded that Plaintiff would only be on the upper floor for one night and would then be moved to Z Block, basement floor the following day.

The next day, July 16, 2009, Plaintiff was removed from his cell without explanation.  According to Plaintiff, he felt that he was being transferred to the basement floor as previously discussed.   However, Wiggins was not  taken to Z Block basement

3

cell as previously promised but rather was placed in a USP-Lewisburg Z Block six person recreation cage which was already occupied by four other inmates who were unknown to the Plaintiff.  Wiggins was purportedly not given a choice as to whether he wanted to go to recreation, or informed in advance who would be in his recreation cage.  Other recreation cages were empty at the time.

The four prisoners in the recreation cage were known members of the DWB gang and Plaintiff was immediately attacked and stabbed twenty-two (22) times with a metal knife.  The weapon was handed to one of Wiggins' assailants by a prisoner in an adjoining recreation cage.  As a result of the assault, Plaintiff suffered serious injuries which required surgery and a one week hospitalization.

Wiggins contends that the individual Remaining Defendants failed to protect his safety because they were aware of the longstanding separation requirement between he and DWB members yet still placed him in a recreation cage with known members of that gang.  Plaintiff also points outs that in the months preceding his attack, there had been multiple assaults in the Z Block recreation cages.  Moreover, USP-Lewisburg Post Orders in effect at that time required officers to pat search and use a hand held metal detector to search each SMU prisoner for weapons when they leave their cells. Other Post Orders also required close monitoring of inmates in the Z Block recreation cages and that area be searched for weapons.  Plaintiff maintains that compliance with those orders should have prevented his attackers from being armed with a knife.

It is also asserted that those Remaining Defendants who were present at the time

4

of the attack failed to  timely intervene. Furthermore, Defendant Hornberger allegedly

failed to sweep the recreation are for any contraband on the day of the attack.

Furthermore, due to an alleged lack of adequate supervision a seven inch metal knife was

passed from inmates in an adjoining cell to the DWB prisoners which was then used to

stab Wiggins.   Plaintiff seeks compensatory and punitive damages.

**Discussion**

**Motion to Dismiss**

Remaining Defendants' pending dispositive motion is supported by evidentiary

materials outside the pleadings.  Federal Rule of Civil Procedure 12(d) provides in part as

follows:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside
> the pleading are presented to and not excluded by the court,
> the motion must be treated as one for summary judgment
> under Rule 56. All parties must be given reasonable
> opportunity to present all the material that is pertinent to the
> motion.

Fed. R. Civ. P. 12(b)(d).

This Court will not exclude the evidentiary materials accompanying the Remaining

Defendants' motion.  Thus, their motion will be treated as solely seeking summary

judgment.  See Latham v. United States, 306 Fed. Appx. 716, 718 (3d Cir. 2009)(when a

motion to dismiss has been framed alternatively as a motion for summary judgment such

as in the present case, the alternative filing "is sufficient to place the parties on notice that

summary judgment might be entered.")

## **Summary Judgment**

Summary judgment is proper if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); See also Saldana v. Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 248.  The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Saldana, 260 F.3d at 232; see also Reeder v. Sybron Transition Corp., 142 F.R.D. 607, 609 (M.D. Pa. 1992).  Unsubstantiated arguments made in briefs are not considered evidence of asserted facts.  Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in its complaint.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

showing that there is a genuine issue for trial." Id. (internal quotations omitted); see also Saldana, 260 F.3d at 232 (citations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial." Celotex, 477 U.S. at 322-23.  "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'"  Saldana, 260 F.3d at 232 (quoting Williams v. Borough of West Chester, 891 F.2d 458, 460-61 (3d Cir. 1989)).

**Warden Bledsoe**

Plaintiff contends that Warden Bledsoe was involved in the decision to move him to Z Block and  failed to institute policies to make recreation safer for SMU prisoners despite his knowledge that violence was increasing in the SMU including the recreation cages.  See Doc. 91-1, p. 14.  Remaining Defendants argue that there are no facts alleged in the second amended complaint which could support a claim of supervisor liability against Warden Bledsoe.  See  Doc. 100, p. 12.

In support of their argument, they have submitted a declaration under penalty of perjury by now retired Warden Bledsoe.  See Doc. 101-1 , Exhibit 1.  Bledsoe states that beginning in 2009 USP-Lewisburg began gradually converting from an open population penitentiary to a predominately SMU wide facility.  As part of that process, multiple new safety procedures were implemented including:   the hiring of, additional correctional staff, installation of additional recreation cages and security cameras, inmates initially entering the SMU were now x rayed for contraband,  and all inmates coming out of their

cells were pat searched and searched with a hand held metal detector.  Bledsoe does not specifically address the claim that he was involved in any cell change decisions for the Plaintiff.  The former Warden does state that his role at USP-Lewisburg was to provide administrative direction over supervisory staff.

A plaintiff, in order to state an actionable civil rights claim, must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of law, and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Shaw by Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d Cir. 1990).

Federal civil rights claims brought under § 1983 cannot be premised on a theory of respondeat superior.  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Rather, each named defendant must be shown, via the complaint's allegations, to have been personally involved in the events or occurrences which underlie a claim.  See Rizzo v. Goode, 423 U.S. 362 (1976); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976).  As explained in Rode:

> A defendant in a civil rights action must have personal involvement in the alleged wrongs. . . .  [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.  Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Rode, 845 F.2d at 1207.  Hence, a claim asserted solely on the basis of a defendant's supervisory position within a prison is insufficient.

Prisoners also have no constitutionally protected right to a grievance procedure.

See Jones v. North Carolina Prisoners' Labor Union, Inc., 433 U.S. 119, 137-38 (1977)(Burger, C.J., concurring) ("I do not suggest that the [grievance] procedures are constitutionally mandated."); Speight v. Sims, No. 08-2038, 2008 WL 2600723 at *1 (3d. Cir. Jun 30, 2008)(citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir. 2001)("[T]he existence of a prison grievance procedure confers no liberty interest on a prisoner.")

While prisoners do have a constitutional right to seek redress of their grievances from the government, that right is the right of access to the courts which is not compromised by the failure of prison officials to address an inmate's grievance.  See Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991) (federal grievance regulations providing for administrative remedy procedure do not create liberty interest in access to that procedure). Pursuant to those decisions, any attempt by Plaintiff to establish liability against Warden Bledsoe based upon that Defendant's review of his administrative grievances or complaints does not support a constitutional claim.  See also Alexander v. Gennarini, 144 Fed. Appx. 924, 925 (3d Cir. 2005)(involvement in post-incident grievance process not a basis for § 1983 liability); Pryor-El v. Kelly, 892 F. Supp. 261, 275 (D. D.C. 1995) (because prison grievance procedure does not confer any substantive constitutional rights upon prison inmates, the prison officials' failure to comply with grievance procedure is not actionable).

However, a claim that a supervisor knew that a policy or procedure in place at the relevant time created an unreasonable risk of a constitutional violation and the supervisor was deliberately indifferent to that risk is sufficient to set forth a viable constitutional claim.  See  Beers-Capitol v. Wetzel, 256 F.3d 120, 133-34 (3d Cir. 2001).

According to undisputed evidence, correctional staff including the prison's Cell Assignment Committee were required to consider an inmate's known separation needs when making cell and recreation cage assignments.[3]  Thus, there were clearly  policies in place to ensure that recreation cell assignments took into consideration an inmate's separation needs.  Moreover, there are no credible facts presented by the Plaintiff that the Warden had actual personal involvement in either the decision to transfer him to Z Block or as to which Z Block cell or recreation cage he should be assigned.

The second amended complaint generally contends that Bledsoe was aware that the there were high levels of inmate on inmate assaults taking place in the recreation cages and failed to institute policies to address that problem.  See Doc. 91-1, ¶ 63-4.  It is undisputed that SMU Post Orders at USP-Lewisburg required that inmates removed from their cells be pat searched and screen with a hand held metal detector.  The Plaintiff suggests that the presence of a weapon in the recreation cages stemmed from a failure to carry out that mandated procedure.  Wiggins further claims that Defendant Hornberger failed to follow other Post Orders by failing to perform a security sweep of the recreation area.  Furthermore, while in the recreation cages, prison procedures require that SMU prisoners are to be directly supervised by the on duty recreation officer.  Once again it is alleged by Wiggins that there was a failure to adhere to that existing prison policy which led to the introduction of a knife into Plaintiff's recreation cage.

---

[3]  Often new inmates entering the prison were provided with a "Quay Meeting", during which representatives of each department in the prison (not including the Warden) and the prisoner himself would discuss cell assignments including any needs for separation. The record indicates that Plaintiff was not afforded a Quay Meeting.

Although Wiggins' expert opines that the placement of six (6) inmates in a single recreation cage was an ill advised decision, the expert acknowledges that it was the transfer of Plaintiff to the third floor of Z block and the placement of Wiggins in a recreation cage with DWB memberss which led to disaster for the prisoner.[4]   Plaintiff himself admits that his Z Block transfer, recreation cage placement, and the inspection and supervision of the recreation cage on the date in question were each undertaken in a manner which was contrary to existing prison Post Orders and procedures.

Thus, this is not a case where a policy or practice established by Warden Bledsoe directly caused harm to the Plaintiff.  There is also no basis for a claim that Blesdsoe was failed to create a policy to correct that problem.  Rather,  it was an alleged failure to follow established procedures by correctional staff which led to Wiggins' assault.  As such, Warden Bledsoe is entitled to summary judgment.   While a better designed with lesser occupancy SMU recreation cage may have been preferable any such claim that such policy should have been implemented by Bledsoe is undermined by the undisputed fact that there were available empty recreation cages at the time of the incident and that the supervising correctional staff elected not to place Wiggins in an empty cage.

In conclusion, based upon the undisputed facts the Warden was not personally involved in the ordering or approving of Wiggins' Z Block transfer.  The Defendant  was also not otherwise personally involved in any conduct or lack of action which led to Plaintiff's injuries.  As such, a discernible basis for liability against Warden Bledsoe has

---

[4]  It is noted that the number of inmates placed in SMU recreation cages at USP-Lewisburg was subsequently reduced.

not been asserted.  Summary judgment will be granted in favor of Warden Bledsoe on the basis of lack of personal involvement.

 **Failure to Protect**

Remaining Defendants next argue that Adami, Heath, Fleming, Crawford, and Hornberger are entitled to entry of summary judgment because they did not deliberately ignore a known serious risk of harm to Wiggins.  See  Doc.100, p. 16.

The Eighth Amendment's prohibition of cruel and unusual punishment imposes duties on prison officials to provide prisoners with the basic necessities of life, such as food, clothing, shelter, sanitation, medical care and personal safety.  See Farmer v. Brennan, 511 U.S. 825, 832 (1994); Helling v. McKinney, 509 U.S. 25, 31 (1993). Under Farmer, an inmate must surmount the high hurdle of showing that a prison official actually knew or was aware of a substantial risk to inmate safety and deliberately disregarded that risk.  Beers-Capitol v. Whetzel, 256 F. 3d 120, 125 (3d Cir.  2001).  This requirement of actual knowledge means that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

Prison officials violate an inmate's right to be free from cruel and unusual punishment when, through intentional conduct or deliberate indifference, they subject the inmate to violence at the hands of another prisoner.  Young v. Quinlan, 960 F.2d 351, 361 (3d Cir. 1992); Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985).  Mere negligent conduct that leads to serious injury of a prisoner by a prisoner does not expose a prison official to civil rights liability.  Davidson v. Cannon, 474 U.S. 344, 347-48 (1986).   The victim's

custodial officials are exposed to civil rights liability only when if one " <u>knows</u> <u>or</u> <u>should</u> <u>have</u> <u>known</u> of a sufficiently serious danger to [the] inmate." <u>Young</u>, 960 F.2d at 361; <u>see</u> <u>also</u> <u>Martin v. White</u>, 742 F.2d 469, 474 (8th Cir. 1984).

The Third Circuit Court of Appeals has "stress[ed], however, that in constitutional context 'should have known' is a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts." <u>Young</u>, 960 F.2d at 361.  As our Court of Appeals explained the phrase, "does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence." <u>Colburn v. Upper Darby Township</u>, 946 F.2d 1017, 1025 (3d Cir. 1991).  Instead, "[i]t connotes something more than a negligent failure to appreciate the risk . . ., though something less than subjective appreciation of that risk." <u>Id</u>.  Moreover, "the risk of . . . injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." <u>Id</u>.  Consequently, liability only attaches when there is a "pervasive risk of harm to inmates from other prisoners,[5] . . . and that the prison officials have displayed 'deliberate indifference' to the danger." <u>Riley</u>, 777 F.2d at 147.

**Unit Manager Adami**

With respect to Unit Manager Adami, Plaintiff contends that said Defendant wwas given information which should have prevented Plaintiff's transfer  to Z Block but

---

5.  The Court of Appeals for the Third Circuit has noted that "prison officials should, at a minimum, investigate each allegation of violence or threat of violence." <u>Young</u>, 960 F.2d at 363 n.23.

neglected to take appropriate action to protect his safety.

Remaining Defendants maintain that once Plaintiff informed Adami of his need to be separated from DWBs who resided on the third floor of Z Block, Adami took appropriate action by stating that Wiggins would be placed in a single cell on the third floor for only one night and would be moved the following day from the third floor to a basement cell in the same unit.[6]  Since there is no claim that Adami ordered or knew that Plaintiff would be taken to recreation prior to being moved to the basement cell Remaining Defendants conclude there is no basis for a claim of deliberate indifference against Adami.

Plaintiff counters that Adami had first hand knowledge of Plaintiff's need to be kept separated from DWBs because he was Unit Manager for both B Block and Z Block during the relevant time frame.  As Unit Manager he was also aware that SMU prisoners were often violent and of the potential for violence to occur in the USP-Lewisburg recreation cages.  Wiggins contends that prior to his Z lock transfer he told Adami that such a transfer posed a threat to his safety because of the presence of DWBs including one individual formerly housed at USP-Victorville in Z Block.  Despite that knowledge, Adami nonetheless allowed Plaintiff's move to the third floor of Z Block where  DWBs were also housed, a decision which Plaintiff contends constitutes deliberate indifference. It is further alleged that other prisoners also told Adami that Plaintiff would be in danger if housed on Z Block with the DWBs and there is no indication that Adami took any steps

---

[6]  Plaintiff maintains that there has been no evidence establishing that Plaintiff was in fact going to be moved to the basement floor.

whatsoever to ensure that Plaintiff would not be assigned to the same recreation cage as the DWBs. It is also noted that even if Wiggins was housed in a Z Block single cell there was still a potential for Plaintiff to have direct contact with the DWBs when in the recreation cages.

Plaintiff has also submitted an expert report by Mark Bezy, a former BOP official with twenty-eight (28) years of experience. Bezy was previously employed as a Warden/ Associate Warden at multiple federal correctional facilities. See Doc. 107-5, Exhibit 49. Bezy opines that Adami failed to follow sound correctional practices by not making sure that Wiggins was not placed on the third floor of Z Block or at a minimum to ensure that he had no personal contact with the DWBs on that floor. See id. at p. 15.

This Court has reviewed the parties' voluminous factual submissions including the multiple depositions, institutional records, videotapes, and Bezy's expert report. Based upon that review, there have been facts presented showing that Plaintiff was kept separated from the DWBs during the first fourteen (14) months of his stay at USP-Lewisburg. Wiggins was moved to the third floor of Z Block on July 15, 2009, the very same floor where DWBs resided including one member who had previously been housed at USP-Victorville.[7] It is noted that institutional records do not identify who ordered Wiggins' Z Block transfer. There are clearly issues of material fact in dispute as to why Plaintiff was transferred. Specifically, Plaintiff contends that Adami was aware and had

---

[7] Remaining Defendants suggest that after a threat assessment was conducted by prison staff, Plaintiff was moved to a different cellbecause he was still active in the DWBs while at USP-Lewisburg and had organized assaults while at the prison. The threat assessment recommended that Plaintiff be separated from certain prisoners, none of whom were involved in the subsequent attack.

acknowledged the need for him to be separated from DWBs while Defendants indicate that there had been no determination that such a separation was warranted. P

Unit Manager Adami was in charge of both Z Block and B Block (the unit where Wiggins was transferred from) , and oversaw the cell assignments in those units  in July, 2009.  Clearly, Unit Manager Adami's ill advised failure to prevent the Plaintiff from being moved to Z Block and placed on the same floor (even temporarily) of that housing unit[8] as other DWBs was a decision which led in part to the inmate's assault the following day.  It is also noted that there is no indication that Adami took any precautions to ensure that Plaintiff was not placed in a recreation cage with DWBs while in Z Block.

Based upon an application of the above well settled standards and since it appears that there are disputed factual issues as to the descionmaking undertaken by Adami with respect to the Plaintiff's transfer to Z Block, this request for entry of summary judgment will be denied.

**Fleming/Crawford**

According to the Plaintiff, Lieutenant Fleming became aware of the Plaintiff's need to be kept separated from DWBs after a May, 2008 conversation with Wiggins.   On or about July 15, 2009 Wiggins allegedly sent a written cop out form to Fleming stating that he was in danger from Z Block DWBs who were formerly housed at USP-Victorville..  Fleming purportedly passed this request on for further investigation without taking any immediate action .  Hours later Plaintiff was assaulted.  Plaintiff contends that by simply passing on his written request rather then taking expedited action in response to

---

[8]  Recreation cage groups are made up from prisoners from the same floor.

a clear and imminent threat Fleming was deliberately indifferent to an obvious threat.

Wiggins purportedly told Correctional Officer Crawford three times on July 15, 2009 that he should not be taken to the third floor of Z Block because there would be problems because prisoners from USP-Victorville already residing in that unit. Crawford was also allegedly aware of Plaintiff's prior history at USP-Victorville and the circumstances surrounding his transfer from that facility. Plaintiff concludes that because Crawford took no action in response to his warnings, the Defendant was deliberately indifferent to his imminent safety needs.

Remaining Defendants argue that since Fleming took reasonable action by turning over a vague cop out from the Plaintiff for investigation, a viable claim of failure to protect has not been asserted. See Doc. 100-1, p. 22. They further maintain that since Wiggins only made general statements and provided no specific details of a threat to Crawford, that Defendant is entitled to entry of summary judgment because there are no facts alleged showing that Crawford knew Wiggins would be placed in a recreation cage. See id.

Plaintiff argues that Crawford and Fleming were both aware that Plaintiff faced an obvious risk of harm. Wiggins concludes that by failing to take immediate action those two Defendants acted with deliberate indifference to his safety needs. Based upon an application of the well settled deliberate indifference standards there are clearly disputed issues of material fact as to whether Fleming and Crawford were presented with sufficient information by the Plaintiff which should have warranted them to take immediate action to prevent Plaintiff's exposure to the circumstances which led to the assault. This request

17

for summary judgment will also be denied.

**Heath**

Remaining Defendants contend that SIS Lieutenant Heath, as part of her duties, completed a threat assessment investigation of Wiggins prior to the attack.  As part of that assessment, Heath reviewed a report from officials at USP-Victorville regarding Wiggins and was aware that the inmate had been transferred to USP-Lewisburg because of threats by the DWBs.  Although Heath ultimately determined that Plaintiff needed to be separated from certain inmates at USP-Lewisburg, none of those individuals were Wiggins' assailants. Despite the severity of the threat as detailed by the USP-Victorville report, Heath declined to issue a KAF (Keep Away From) administrative order which would have kept Wiggins apart from all DWBs .during the course of his USP-Lewisburg incarceration.

The Remaining Defendants argue that since there is no evidence or claim that Heath was aware that Plaintiff was going to be moved to Z Block and thereafter taken to a recreation cage there is no basis for a failure to protect claim.

Plaintiff counters that given the well documented threats that Wiggins faced from DWBs Heath was aware of the risks placing Plaintiff with his assailants and failed to take appropriate measures.  See Doc. 103-1, pp.14-15.

This Court has conducted a review of the voluminous supporting factual materials presented by the parties.  Based upon that review,  there are clearly disputed issues of material facts as to whether Heath's failure to issue a KAF order constituted deliberate indifference to an apparent substantial risk of harm.  Since Heath's failure to issue a KAF

order decision was reached despite the Defendant's possession of information that DWBs posed a threat to Wiggins' well being, arguably would have prevented Plaintiff from being transferred to Z Block or thereafter placed in a recreation cage with DWBs. Clearly there is a dispute of material fact regarding the reasonableness of Defendant Heath's decisonmaking and whether it constituted a failure to protect the Plaintiff from a clear and significant risk of harm. As such, entry of summary judgment is precluded.

**Hornberger**

Remaining Defendants contend that Wiggins did not inform escorting/supervising Correctional Officer Hornberger that he had any safety concerns or that he had any problems with any of the other prisoners in the recreation cage on the day of his assault. Since there is no evidence that Hornberger "was aware of any appreciated risk to Wiggins, safety" Remaining Defendants argue that the officer is entitled to entry of summary judgment. Doc.100 , p. 24.

Plaintiff counters that this argument is lacking because under Post Orders Hornberger was responsible for searching and supervising the recreation cage and failed to fulfill his duties by allowing a metal knife to be brought into an adjoining cage, failing to prevent that weapon from being passed to one of Wiggins' assailants, and by not directly supervising the cages.

It is undisputed that Defendant Hornberger was the Z Block recreation officer on duty when Plaintiff was repeatedly stabbed on July 16, 2009. In fact, he was the individual who opened the recreation cage for Wiggins to enter. Wiggins alleges that Hornberger failed to properly supervise the inmates in the recreation cages on that date. It

19

is specifically asserted that despite Post Orders requiring that he do so said Defendant did not properly search the cages prior to prisoners entering the recreation area on the day of the attack.  The officer also purportedly failed to undertake direct supervision of the recreation cages at the time of the attack.  It is asserted by Wiggins that direct supervision would have prevented the passing of a knife from an adjoining recreation cage to one of Plaintiff's assailants.  Finally it is alleged that the entire incident could have been avoided in the Plaintiff was simply placed in one of the empty recreation cages.

It is undisputed that a weapon was used to inflict multiple stab wounds and that Hornberger was on duty during the relevant time period.  The weapon was brought into an adjoining recreation cage and later passed to one of Plaintiff's attackers.  Based upon a review of the record, including videotape footage of the incident itself, there are clearly existing issues of material fact as to whether Hornberger's actions on the date of the assault complied with his responsibilities under the existing prison Post Orders for the SMU recreation cages.  Given the parties' material factual disputes granting this request for summary judgment is not warranted..

## **Qualified Immunity**

Qualified immunity is an affirmative defense which must be pleaded by the defendant official.  Verney v. Pennsylvania Turnpike Comm'n, 881 F. Supp. 145, 149 (M.D. Pa. 1995).  In Harlow v. Fitzgerald, 457 U.S. 800 (1982), the United States Supreme Court held "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person

would have known." Id. at 818; Sherwood v. Mulvihill, 113 F.3d 396, 398-99 (3d Cir.

1997); Showers v. Spangler, 957 F. Supp. 584, 589 (M.D. Pa. 1997).  It has also been held

that "qualified immunity is coextensive for suits brought against state officials under 42

U.S.C. § 1983 (1982), and for suits brought directly under the Constitution against federal

officials." People of Three Mile Island v. Nuclear Regulatory Commissioners, 747 F.2d

139, 144 n.9 (3d Cir. 1984) (citing Butz v. Economou, 438 U.S. 478, 504 (1978)).

When properly applied it protects "all but the plainly incvompetent or those who

knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).    The United

States Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001),  established a two part test

for analyzing qualified immunity claims. See also  Curley v. Klem, 298 F.3d 271 (3d Cir.

2002); Bennett v. Murphy, 274 F.3d 133 (3d Cir. 2002).

The initial inquiry in a qualified immunity examination is whether "the facts taken

in the light most favorable to the plaintiff show a constitutional violation." Bennett, 274

F.3d at 136.  The second prong requires a determination as to whether the constitutional

right at issue was clearly established.  If so, then a court must inquire as to "whether it

would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted." Saucier, 533 U.S. at 201.  A determination that the conduct violated a

clearly established constitutional right precludes the granting of qualified immunity.

The second step of Saucier requires district courts "to determine whether the

constitutional right was clearly established." Bennett, 274 F.3d at 136.  Under this

analysis, "[i]f it would not have been clear to a reasonable officer *what the law required*

under the facts alleged, he is entitled to qualified immunity." Id.; See also Ezenwa v.

Gallen, 906 F. Supp. 978, 986 (M.D. Pa. 1995) (quoting Harlow, 457 U.S. at 818) (qualified immunity will shield a governmental official from liability if that official's conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'").  "A right is clearly established if it would be "clear to a reasonable officer that the conduct was unlawful in the situation he confronted." Jones v. Jersey City, 2002 WL 1877036 *1 (3d Cir.  Aug. 15, 2002)(quoting Saucier, 533 U.S. at 202).  This Circuit has also held that while governmental officials are not required to anticipate the development of new legal standards, they must apply general, well developed, legal principles.  Three Mile Island, 747 F.2d at 144-45.

"A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every reasonable official would have understood that wht he is doing violates that right,'" Mammaro v. New Jersey Div. Of Child Protection and Permanency, 814 F. 3d 164 , 167 (3d Cir. 2016).  It was well established at the time of the challenged conduct any reasonable correctional officer would have known that under decisions such as Young, he or she violates an inmate's right to be free from cruel and unusual punishment when, through intentional conduct or deliberate indifference, they subject the prisoner to violence at the hands of another prisoner.  Moreover, the BOP enacted rules and procedures, Post Orders, for its correctional officers regarding their need to protect inmates from attack by fellow prisoners.

Plaintiff's factual submissions, viewed in the light most favorable to him, shows that the Remaining Defendants knew or should have known that they were violating his

constitutional rights as well as Post Orders with respect to their failure to protect Wiggins'

safety by assigning him to a housing unit and thereafter a recreation cage which housed

prisoners who posed a clear threat to his safety.  Second, by failing to inspect prisoners

entering the recreation area for weapons as well as by not adequately supervising and

searching the recreation cages.  Consequently, this Court is satisfied that the first two

prongs of <u>Saucier</u> were satisfied.  <u>See</u> <u>Curley</u>, 298 F.3d 271, 2002 WL 1774048 *18 ("a

decision on qualified immunity will be premature when there are unresolved disputes of

historical fact relevant to the immunity analysis.").

Since the facts when viewed in a light most favorable to Wiggins could establish

that the purported conduct regarding Plaintiff's transfer to a different housing unit and

thereafter the inmate's placement and supervision in a recreation cage by the involved

individual Remaining Defendants violated clearly established constitutional standards,

under <u>Saucier</u>, they are not entitled to qualified immunity at the summary judgment stage.

However, as noted by the Third Circuit court of Appeals, an officer may still

contend that he reasonably, but mistakenly, believed that his actions was justified by the

circumstances as he perceived them; this contention however, must be considered at trial.

<u>See</u> <u>generally</u>,  <u>Bennett</u>, 274 F.3d at 137.

**FTCA**

Plaintiff asserts that prison officials knew or should have known that Plaintiff

daced an excessive risk to his safety and negligently breached their duty by failing to take

any actions to protect him.  <u>See</u> Doc. 91, p. 16.

The FTCA provides a remedy in damages for the simple negligence of employees

23

of the United States.  See United States v. Muniz, 374 U.S. 150, 150 (1963).  Under the FTCA, sovereign immunity is waived against persons suing the federal government for the commission of various torts.  See Simon v. United States, 341 F. 3d 193, 200 (3d Cir. 2003).

 A plaintiff pursuing an FTCA claim must show:  (1) that a duty was owed to him by a defendant; (2) a negligent breach of said duty; and (3) that the negligent breach was the proximate cause of the plaintiff's injury/loss.  Mahler v. United States, 196 F. Supp. 362, 364 (W.D. Pa. 1961).  The only proper Defendant for purposes of an FTCA claim is the United States of America.  See 28 U.S.C. § 2679(d).  Except for limited circumstances, an FTCA claim in federal court is limited to recovery of the sum certain amount requested in the underlying administrative claim.  See McMichael v. United States, 856 F.2d 1026, 1035 (8th Cir. 1988).

A federal district court addressing an FTCA action must apply the law of the state, in this case Pennsylvania, in which the alleged tortious conduct occurred.  28 U.S.C. § 1346(b) (1996); Toole v. United States, 588 F.2d 403, 406 (3d Cir. 1978); O'Neal v. Department of Army, 852 F. Supp. 327, 334-35 (M.D. Pa. 1994); Turner v. Miller, 679 F. Supp. 441, 443 (M.D. Pa. 1987).  However, in cases such as this which involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence.  See 18 U.S.C. § 4042; Turner, 679 F. Supp. at 443.

The applicable law with respect to the burden and quantum of proof under the FTCA remains that of the state in which the alleged tortious conduct occurred.  Hossic v. United States, 682 F. Supp. 23, 25 (M.D. Pa. 1987). Under Pennsylvania law, a plaintiff is

required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence.  Baum v. United States, 541 F. Supp. 1349, 1351 (M.D. Pa. 1982).[9]

**Discretionary Function**

Remaining Defendants assert that the FTCA claims based upon the alleged failure to search inmates entering the recreation cages, failure to search the recreation cages prior to their use and lack of monitoring of the recreation cages are precluded by the discretionary function exception.  See Doc. 100, p. 43.

A significant limitation on FTCA claims is imposed by 28 U.S.C. § 2680(a), which provides that liability may not be premised on a claim against a government employee which is "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty." "Conduct is not discretionary unless it involves an element of judgment or choice.'  Koch v. United States,  814 F. Supp. 1221, 1227 (M.D. Pa. 1993).  Federal employees such as correctional officers employed by the Bureau of Prisons simply "do not have discretion to violate mandatory requirements" or constitutional rights.  Koch, 814 F. Supp. at 1228.  If the discretionary function exception applies, then the claim must be dismissed for lack of subject matter jurisdiction.  See Garcia v. United States, 896 F. Supp. 467, 471 (E.D. Pa. 1995).  The United States bears the burden of establishing applicability of the discretionary function exception.  See Merando v. United States, 517 F.3d 160, 164 (3d Cir. 2008).

---

[9]  Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury.  Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978).

In <u>Berkovitz v. United States</u>, 486 U.S. 531 (1988), the United States Supreme

Court adopted a two part inquiry with respect to § 2680(a).  First, a court must decide if "a

federal statute, regulation or policy specifically prescribes a course of action for an

employee to follow."  <u>Id</u>. at 536.  If so, "the employee has no rightful option but to adhere

to the directive."   <u>Id</u>.  The second part of the inquiry provides that if the decision was one

"which balances competing considerations or identifiable policy factors such as budgetary

considerations, safety concerns, allocation of limited resources, etc. may be

discretionary." <u>Koch</u>, 814 F. Supp at 1227, citing <u>Johnson v. United States, Department

of the Interior</u>, 949 F.2d 332, 340 (10th Cir. 1991).

In <u>Mitchell v. United States</u>, 225 F.3d 361, 363 (3d Cir. 2000) the Third Circuit

opined that with respect to the first prong a court must determine if the challenged

involved an element of of judgement or choice.  If there is a statute, regulation or policy

which specifically prescribes a course of action which an employee must follow the

exception does not apply.

18 U.S.C. § 4042 imposes a general duty of care on the BOP to safeguard its

prisoners.  However, the regulation does not dictate the manner by which that duty is to

be fulfilled.  <u>See</u> <u>Cohen v. United States</u>, 151 F.3d  1338,1343 (11th Cir. 1998).  Hence,

the BOP has the ability to exercise its judgment on how its duty under § 4042 is to be

fulfilled.  As recognized by the Third Circuit Court of Appeals, a  judgment as to the best

way to protect prisoners from attack by other prisoners is the type of decision that the

discretionary function exception was designed to shield.  <u>Thrower v. United States</u>, 528

Fed. Appx. 108, 110 (3d Cir. 2013).  <u>See</u> <u>also</u> <u>Donaldson v. United States</u>, 281 Fed. Appx.

75, 77 (3d Cir. 2008)(the "BOP retains sufficient discretion in the means it may use to fulfill" its duty of protecting prisoners from being assaulted by other inmates.

However, in this case, there were additional applicable federal regulations or policies, specifically mandatory USP-Lewisburg Post Orders pertaining to the searching of inmates and the duties of the recreation officer, which required USP-Lewisburg correctional staff to take particular courses of action, i.e., SMU prisoners leaving their cells are to pat searched and a hand held metal detector will be used and the recreation officer must search the recreation area.

The Post Orders requiring that SMU inmates who leave their cells must be pat searched and examined with a hand held metal detector do not involve an element of choice.  As such, the discretionary function exception is not applicable with respect to that claim. See  Rivera v. United States, Civ. No. 3:12-cv-1339, 2013 WL 5492483 at *6. (M.D. Pa. Oct. 2, 2013)(Kosik, J.)

Another USP-Lewisburg Post Order requires that officers performing recreation cage supervision must directly supervise the inmates and sweep the area. With respect to the later, the Post Order states that the recreation officer must shakedown the recreation pens (cages) for contraband and security discrepancies.  This policy also does not involve an element of choice and is likewise not covered by the discretionary function exception.

The other portion of the above Post Order states that the recreation officer must provide direct supervision over the prisoners in the recreation cages..  According to the Remaining Defendants, the general wording of this provision arguably includes an element of choice or judgment.  See Doc. 100, p. 52.

27

In light of submitted video evidence of the incident, the Plaintiff contends that there are clearly issues of material fact as to whether there was any direct supervision at all during the relevant time period.  They conclude that this is not a case where there was a challenged exercise of judgment or discretion but rather a situation where there was an absence of any type of direct supervision whatsoever.  <u>See</u> Doc. 103-2, p. 9.

Video footage of the incident which has been submitted for consideration shows that a officer placed Wiggins in the recreation cage and then walked away and that a prisoner in the recreation cage was thereafter handed a knife by a prisoner from an adjoining cage.  In light of that undisputed evidence, this Court agrees that are issues of material fact in dispute as to whether the discretionary function exception is available with respect to a claim of lack of direct supervision of the recreation cage.

**<u>Res Ipsa Loquitor</u>**

Remaining Defendants next contend that the doctrine of <u>res</u> <u>ipsa</u> <u>loquitor</u> does not apply to any FTCA clam relating to any alleged failure to properly search and use  a hand held metal detector on the inmates entering the recreation cages on the day of the incident. <u>See</u>  Doc. 100, p. 53.

The doctrine of <u>res</u> <u>ipsa</u> <u>loquitor</u> provides that circumstances surrounding an injury may give rise to an inference of negligence.  Plaintiff contends and it is undisputed that he was stabbed with a weapon in the recreation cage.  It is equally undisputed that a prisoner in an adjoining recreation cage passed the weapon to one of Wiggins' assailants.  What is unclear is how the weapon made its way into a recreation cage.

Plaintiff asserts that the presence of the weapon was due to a failure of prison staff

to properly search either the inmates entering the recreation cage or the recreation cage area itself concluding that if those required measures had been properly undertaken the weapon could not have been used against Wiggins.

Remaining Defendants contend that the presence of the weapon does not necessarily infer negligence by the USP-Lewisburg staff as the source of the weapon is unknown and it could ended up in the cage for a variety of reasons . For example, it is suggested that the weapon could have simply been the result of a skillful hiding of the weapon by a prisoner which evaded detection despite reasonable search by correctional staff as mandated by the Post Orders.

Res ipsa loquitor is a "circumstantial evidence doctrine usually reserved for trial." Rivera v. United States, Civ. No. 3:12-cv-1339, 2013 WL 5492483 at *6 (M.D. Pa. Oct. 2, 2013)(Kosik, J.). It has been recognized that if a plaintiff cannot eliminate the conduct of third parties then there is insufficient evidence to support a trial based upon res ipsa loquitor . See Ahora-Blanco v. United States, Civ No. 4:11-cv-1575, 2013 WL 6328467 (M.D. Pa. Dec. 5, 2013).

This Court that Plaintiff has raised sufficient facts to avoid entry of summary judgment  and the issue of reliance by the Plaintiff on the doctrine of res ipsa loquitor will be reserved for trial.


**Negligent Search**

Remaining Defendants' final argument is that Plaintiff has not presented any evidence showing that the recreation officer failed to reasonably search the recreation

cages and supervise the inmates therein.  See Doc. 100, p. 58.

As previously discussed, a weapon was clearly introduced into the recreation cages on the date in question.  Second, videotape footage of the incident arguably shows that Plaintiff's recreation cage was not being supervised at the time of the incident.[10]

Based upon those considerations as well as review of the voluminous supporting evidence presented by both sides,  there are material issues of disputed fact with respect to Plaintiff's FTCA search and supervision related claims which preclude the Defendants' remaining request for entry of summary judgment.

In conclusion, the motion for summary judgment will be partially granted.  A status conference will be scheduled by the Court.  An appropriate Order will enter.


**BY THE COURT:**


**s/James M. Munley**
**JUDGE JAMES M. MUNLEY**
**United States District Court**

---

[10]  The Court recognizes that Defendant Hornberger maintains that at the time of incident he was standing at a vantage point which allowed him to view all of the recreation cages.