# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WIGGINS,** )  | |
| ) | |
| **Plaintiff,** ) | **Case Number 3:11-cv-1298** |
| ) | |
| **v.** ) | **(Munley, J.)** |
| ) | |
| **BLEDSOE,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## PLAINTIFF'S PRE-TRIAL MEMORANDUM
## (FTCA CLAIMS)

Pursuant to the Court's Scheduling Order (doc. 129) and Local Rule 16,

Plaintiff Ronnie G. Wiggins hereby submits this Pre-Trial Memorandum in

connection with his pending claims under the Federal Tort Claims Act.[1]

---

[1]     Plaintiff is submitting a separate Pre-Trial Memorandum in connection with his pending Eighth Amendment (*Bivens*) claims.

1

## A.    <u>BRIEF STATEMENT AS TO FEDERAL COURT JURISDICTION</u>

This court has jurisdiction to hear Plaintiff's Eighth Amendment claims under 28 U.S.C. § 1331, in accordance with the Federal Tort Claims Act, 28 U.S.C. § 1346.

### B.      SUMMARY STATEMENT OF FACTS AND CONTENTIONS AS TO LIABILITY

**I.      Factual Background**

**A.      Mr. Wiggins is Stabbed 22 Times**

On the morning of July 16, 2009, Ronnie Wiggins, an inmate at the United States Penitentiary in Lewisburg, PA ("Lewisburg"), was savagely assaulted by four other inmates and stabbed 22 times with a 6.5-inch metal knife.  The lead up to the assault, the stabbing, and the guards' lackadaisical response in the aftermath are captured on video.  Mr. Wiggins is now seeking damages for the staggering combination of negligence and indifference on the part of Lewisburg officials that led directly to the assault and the permanent injuries he suffered.

**B.      The Extreme Danger at the Lewisburg Special Management Unit**

Mr. Wiggins was an inmate at the Special Management Unit ("SMU") at Lewisburg.  The SMU was an experiment within the federal Bureau of Prisons to remove dangerous inmates from the general population of other institutions and place them together in the SMU.  As Defendant Heath testified: "*A lot of times inmates' conduct at other institutions just catches up with them here at Lewisburg because we have everybody here.* All sorts, all the gangs."

SMU inmates were confined to their cells for 23 hours per day, with one hour per day spent in outdoor recreation ("rec") cages.  To protect the guards, the SMU had special rules in place limiting officers' ability to respond to attacks by

one inmate on another inmate.  Guards were not permitted to intervene to stop an inmate on inmate attack until a lieutenant was present and the guards outnumbered the inmates.  Given the choice to limit guards' authority to stop violence once it started, the SMU had procedures in place to protect inmates from armed assaults by other inmates, given that "very disruptive and violent [inmates] have more of a tendency to always try to keep a weapon on them."

### C.     The Z-Block Post Orders

The BOP and individual correctional institutions draft and issue mandatory post orders that dictate the required job duties for each respective post or position at the institution.  These post orders are mandatory and must be followed by corrections officers.  This is essential for the safe and effective operation of the prison facilities.

To help protect inmates and corrections staff in the dangerous climate of the SMU, the Z-Block Post Orders in effect on July 16, 2009, the day of the stabbing, required officers to search and monitor inmates to help prevent the proliferation of weapons.  In order to prevent inmates from using weapons to assault each other and staff, the Z-Block Post Order states under the Category of Inmate Movement/Escort:  "All inmates who are removed from the cell will be pat-searched and a hand-held metal detector utilized for screening."  The Z-Block Post

Orders also require that "a handheld metal detector will be used anytime an inmate is removed from his cell or the recreation areas."

Corrections staff check to determine if the handheld metal detectors, known as "wands," are working properly every time the detectors are employed, including by checking the battery and making sure that the detector picks up metal items. If used properly, the wants would detect a six to seven inch mental knife hidden on an inmate's person.

The Z-Block Post Orders also contain provisions designed to prevent armed assaults in recreation cages: "[a] staff member will remain in the recreation area anytime there is an inmate in a recreation cag, further, staff must "provide direct supervision during the times inmates are outside." This guidance was designed in part designed to ensure that the inmates do not pass contraband, including knives, to each other. Duties of the Recreation Officer involve watching the recreation cage and monitoring "suspicious" inmate activity such as inmates approaching the walls of the pen and passing contraband. Post Orders for the Z-Block Recreation Officer also required the recreation officer to sweep the cages and recreation area for contraband prior to recreation every day

### D.   The Attack on Mr. Wiggins on July 16, 2009

On July 16, 2009, Mr. Wiggins was taken out to a rec cage where his four assailants were waiting for him, all Dirty White Boys. Multiple nearby rec cages

were empty, but Mr. Wiggins was inexplicably placed in the cage with four assailants.  No one told Mr. Wiggins with whom he would be placed in a recreation cage on July 16, 2009, nor was Mr. Wiggins given the choice whether to attend recreation on July 16, 2009.  Neither Mr. Wiggins nor his escorting officer could see who was in the recreation cage into which he was to be placed until Mr. Wiggins was placed in the sallyport of the cage.

After escort staff departed, an inmate in an adjacent rec cage passed a metal knife to one of Mr. Wiggins' waiting assailants.  Moments later, Mr. Wiggins was brutally assaulted and stabbed repeatedly.  Neither Defendant Hornberger—whose job was to supervise the rec cage—nor any other staff member remained in the recreation area during the assault.

Mr. Wiggins suffered severe injuries from the attack requiring hospitalization for seven days, two abdominal surgeries, the insertion of a chest tube to reinflate his left lung, continuing abdominal and hernia complications, and panic attacks and post-traumatic stress.  Those injuries, and related complications, have continued to the present day and have worsened over time.

## II.    Legal and Factual Issues (FTCA Claims)

Mr. Wiggins has an FTCA claim against a single defendant, the United States of America, based on the negligence of the officers at USP-Lewisburg.  Mr.

Wiggins contends that the Defendant's negligence was the direct and proximate cause of his injuries.

## C.    STATEMENT OF UNDISPUTED FACTS

**SMU Background**

1.    Inmates in the Lewisburg SMU program were confined to their cells for twenty-three hours per day.

2.    Inmates in the Lewisburg SMU were offered one hour of recreation per day, which was spent in an outdoor recreation cage.

3.    In July 2009, USP Lewisburg policy and the size of the cages permitted up to six inmates to be placed in a recreation cage simultaneously.

4.    Recreation cages were the only place where SMU inmates could physically interact with inmates other than their cellmates.

**Post Orders Requiring Supervision**

5.    The BOP and individual correctional institutions draft and issue mandatory post orders that dictate the required job duties for each respective post or position at the institution.

6.    Post orders are mandatory, and corrections staff must follow the post orders of the institution and the post orders for their particular position.

7.    Following post orders is essential to the safe and effective operation of a prison facility.

8.    The Z-Block Post Orders in effect on July 16, 2009, the day of the stabbing, required officers to search and supervise inmates to help prevent the proliferation of weapons.

9.    In order to prevent inmates from using weapons to assault each other and staff, the Z-Block Post Order states under the Category of Inmate Movement/Escort:  "All inmates who are removed from the cell will be pat-searched and a hand-held metal detector utilized for screening."

10.    The Z-Block Post Orders also require that "a handheld metal detector will be used anytime an inmate is removed from his cell or the recreation areas."

11.    Corrections staff check to determine if the handheld metal detectors, known as "wands," are working properly every time the detectors are employed,

including by checking the battery and making sure that the detector picks up metal items.

12.     Z-Block Post Orders also contain provisions designed to prevent armed assaults in recreation cages: "[a] staff member will remain in the recreation area anytime there is an inmate in a recreation cage," further, "it is expected staff will provide direct supervision during the times inmates are outside."

13.     These supervision requirements are in part designed to ensure that the inmates do not pass contraband, including knives, to each other.

14.     Accordingly, duties of the Recreation Officer involve watching the recreation cage and monitoring "suspicious" inmate activity such as inmates approaching the walls of the pen and passing contraband.

## The DWB Assault on Wiggins on July 16, 2009

15.     On the morning of July 16, 2009, Wiggins was in cell number 307, on the third floor of Z-Block.

16.     There are no documents explaining who placed Wiggins on the third floor of Z-block or explaining why he was placed there on July 15, 2009.

17.     The BOP did not preserve the video taken by the camera on the third floor of Z-Block on the morning of July 16, 2009.

18.     On July 16, 2009, the Plaintiff was escorted and placed into a recreation pen.

19.     The Lewisburg SMU documented prisoner recreation assignments via the "rec and shower schedule."  The officer creating the rec and shower schedule considers gang affiliations and separations.

20.     Inmates, including Wiggins, were not permitted to choose their recreation group in the SMU program at USP Lewisburg in July of 2009.

21.     On July 16, 2009, four other inmates that were already in the recreation pen assaulted Wiggins resulting in injuries requiring him to transported to an outside medical facility.

22.     The attack on Wiggins consisting of punches, kicks, and more than twenty stab wounds delivered by all four inmates, as they passed the knife around from one to the other.

23.   Defendant Hornberger was assigned as the Z-Block recreation officer at the time that Ronnie Wiggins was stabbed.

24.   Staff arrived at the outside of the recreation pen in less than a minute after the assault began.

25.   After all of the assailants were placed in restraints and removed from the area, staff entered the recreation pen area and medical treatment of the Plaintiff was initiated.

26.   SIS Heath photographed Wiggins' injuries and noticed a sharpened metal weapon near the scene of the incident.

27.   SIS Lieutenant Heath and SIS Tech Dreese walked around the recreation pen to the weapon.

28.   SIS Lieutenant Heath photographed the weapon and Dreese picked it up as evidence.

29.   None of the inmates who assaulted him on July 16, 2009, were CIM separations from him.

30.   The BOP  did not preserve the rec and shower schedule from July 16, 2009.

31.   Inmates, including Wiggins, were not permitted to review the rec and shower sheet to learn who was in his recreation group before they went to a recreation cage in the SMU program at USP Lewisburg on July 16, 2009.

32.   One of Wiggins' assailants, Josh Wren, had been at USP Victorville at the same time as Wiggins and had recently been transferred to the Lewisburg SMU.

33.   All four of Wiggins' assailants were suspects or associates of the Dirty White Boys gang.

34.   Two of Wiggins' assailants (Wren and Brent Layton) had previously assaulted another inmate in a recreation cage in May 2009.

35.   Wiggins suffered severe injuries from the attack.

36.   Defendant Hornberger was assigned as the Z-Block recreation officer at the time that Ronnie Wiggins was stabbed.

37.  As a result of the attack, Wiggins needed immediate surgery in the hospital to address his injuries and spent seven days in the hospital.

38.  Wiggins subsequently developed incisional hernias.

39.  As reflected in his BOP medical records dated after the assault, Wiggins was diagnosed with PTSD while in prison.

40.  As reflected in his BOP medical records dated after the assault, Wiggins suffered anxiety, nightmares, and other psychological injuries.

## D.    BRIEF DESCRIPTION OF DAMAGES

Mr. Wiggins is seeking compensation for the following injuries he sustained as a result of Defendants' conduct:

**Physical pain and suffering**:  Mr. Wiggins suffered severe pain at the time of and shortly after he was stabbed on July 16, 2009 and underwent surgery to treat injuries to his lungs and intestines.  He spent seven days in the hospital following the assault before being discharged. Contemporaneous medical records show that Mr. Wiggins' excruciating pain continued for months; he described his abdominal pain as feeling like "being stabbed with an ice pick" more than five months after the assault and reported abdominal pain (rated "10/10") two years after the assault. Mr. Wiggins' pain and suffering from the stabbing have continued to the present. Mr. Wiggins developed incisional hernias as a result of his injuries and subsequent surgery, which have continued to worsen up to the present day.  Mr. Wiggins has had <u>two</u> failed surgeries to address his hernias (one in 2011 and one in 2016).  Mr. Wiggins is currently scheduled to have a third hernia repair surgery some time in late 2018.

As a result of his hernias, Mr. Wiggins has had severe physical limitations for years that have been documented by prison medical officials.  These limitations are likely to continue indefinitely, even if Mr. Wiggins third surgery is successful.

**<u>Emotional Distress</u>**:  Prison doctors have consistently diagnosed Mr. Wiggins after the attack with anxiety, panic attacks, and post-traumatic syndrome, and he continues to receive counseling and medication for the emotional trauma resulting from the 2009 stabbing.  In addition, Mr. Wiggins will require counseling at least twice a month when he is released

**<u>Future Lost Wages</u>:** Mr. Wiggins is 53 years old. His current prison sentence is scheduled to end in 2022, but he could be paroled as early as October, 2018. Assuming he works until he is 65, he could work up to 12 years.  The physical injuries that Mr. Wiggins sustained in the attack, as well as the hernia that developed as a result of the attack, have severely limited Mr. Wiggins' ability to perform any kind of physical labor.

**<u>Estimated Value of Damages</u>**:  Mr. Wiggins is entitled to $750,000 for his physical and emotional pain and suffering as well as any lost wages associated with his ongoing disability.

## E.   NAMES AND ADDRESSES OF WITNESSES (FTCA CLAIMS)

Plaintiff anticipates that the following witnesses may be called at trial as part

of Plaintiff's FTCA Claims.[2]

| Witness | Party | Specialties/Qualifications (experts only) |
|---------|-------|-------------------------------------------|
| Wiggins, Ronnie | Plaintiff | |
| Bezy, Mark | Plaintiff | 30-year correctional professional with 28 years of service with the Federal Bureau of Prisons, including as Warden. |
| Adami, John | Defendant | |
| Fleming, James | Defendant | |
| Hornberger, Michael | Defendant | |
| Fosnot, James | Third Party (Former defendant) | |
| Bledsoe, Bryan | Third Party (Former defendant) | |

---

[2]     Plaintiff is currently incarcerated in Texas state prison.  His current address is Telford Unit, 3899 Hwy 98, New Boston, TX 75570.  Plaintiff does not yet have address information for the (current and former) BOP witnesses.

### F.   SUMMARY OF TESTIMONY OF EACH EXPERT WITNESS

Plaintiff's Expert Mark Bezy, a 30-year BOP veteran and former Warden, will opine on (1) the creation and operation of Lewisburg's SMU program and (2) whether, if followed, the procedures outlined in the applicable Post Orders would have resulted in the detection of a 7-inch metal knife and, accordingly, would have prevented the assault on Mr. Wiggins.

### G.   SPECIAL COMMENT ABOUT PLEADINGS AND DISCOVERY

1.     Plaintiff Wiggins continues to suffer from injuries caused by Defendants' conduct.  Additional discovery may be necessary to evaluate and document the current and future state of Mr. Wiggins' injuries, including ongoing medical treatment for those injuries.

**H.**   **SUMMARY OF LEGAL ISSUES INVOLVED AND LEGAL AUTHORITIES RELIED UPON (FEDERAL TORT CLAIMS ACT)**

The law surrounding Plaintiff's FTCA claim is well established and was discussed in detail in the Court's decision denying summary judgment on these claims.  *See* Doc. 116; *see also Schingler v. United States,* No. 3:13-cv-1388, 2014 WL 980757, at *3-5 (M.D. Pa. Mar. 13, 2014).  The FTCA permits a suit against the United States for torts committed by "any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1) (2012).

## I.   <u>STIPULATIONS DESIRED</u>

Counsel for Plaintiff and Defendants will continue to meet and confer regarding their respective exhibits, and expect few, if any disputes to arise regarding the admissibility and/or authenticity of those exhibits.  The parties propose to submit final exhibit lists and copies of the exhibits to the Court, together with any stipulations or objections, ten days before the start of trial.

### J.    ESTIMATED NUMBER OF TRIAL DAYS

Plaintiff estimates that three to four days will be needed for a bench trial on Plaintiff's FTCA claims.

### K.   OTHER MATTER PERTINENT TO THE CASE TO BE TRIED

None at this time.

## L.   SCHEDULE OF EXHIBITS

Plaintiff's schedule of exhibits is attached as Appendix 1.

## M.    SPECIAL VERDICT QUESTIONS

None at this time.

## N.    DEFENSE COUNSEL STATEMENT (N/A)

Not Applicable.

## O.     <u>LOCAL RULE 30.10</u>

Plaintiff's counsel certifies that he has conferred with Defendants' counsel and has no objections at this time to the depositions and videotapes subject to this Court's protective order. Plaintiff reserves the right to object to any use of depositions and video at the time of trial.

## P.    REQUEST FOR FINDINGS OF FACT AND LAW
##       PROPOSED FINDINGS OF FACT (FTCA CLAIMS)

Background of the Case

41.    In July 2009 Plaintiff Ronnie Wiggins was an inmate in the Federal

Bureau of Prisons ("BOP").

42.    On July 16, 2009 at the United States Penitentiary in Lewisburg,

Pennsylvania ("USP Lewisburg"), corrections officers placed Mr. Wiggins in a Z-

Block recreation cage with four inmates who savagely assaulted him.

43.    The four attackers stabbed Mr. Wiggins twenty-two times with a 6.5

inch metal knife and punched, kicked, and stomped Mr. Wiggins over the course of

thirty seconds.

44.    The four inmates who attacked Mr. Wiggins were all members of the

Dirty White Boys prison gang (the "DWB").  One of the attackers, Josh Wren,

came to USP Lewisburg from the United States Penitentiary at Victorville,

California ("USP Victorville").

45.    Mr. Wiggins was transferred from USP Victorville to USP Lewisburg

in May 2008 to protect him from those threats.  Mr. Wiggins told staff at USP

Lewisburg about the dangers he faced when he arrived at USP Lewisburg.  Indeed,

BOP documents from June 2008 show that corrections staff at USP Lewisburg

took steps to separate Mr. Wiggins from the DWB.

46.     From his arrival at USP Lewisburg through July 14, 2009, corrections officers at USP Lewisburg prevented Mr. Wiggins from being assigned to a cell or recreation cage with any DWB or other white gang members who had been previously housed at USP Victorville.  As a result, the DWB were unable to carry out their threats on Mr. Wiggins' life.

47.     On July 15, 2009, without any documentation, Mr. Wiggins was moved from one cell block ("B-Block") to another cell block ("Z-Block") at USP Lewisburg.  As corrections staff members were aware, there were multiple known members of the DWB on the same floor of Z-Block, led by an inmate who had recently arrived from USP Victorville.

48.     On the morning of July 16, 2009, Mr. Wiggins was placed in a recreation cage with Josh Wren, the DWB member who had been at USP Victorville with Mr. Wiggins, and three other DWB gang members.  This was the first opportunity since the Victorville Incident that the DWB had a chance to carry out their orders to attack Mr. Wiggins.  Within one minute of Mr. Wiggins entering the cage, his assailants stabbed him twenty two times with a large metal knife.

SMU Background

49.     The Federal Bureau of Prisons designed the Lewisburg SMU program to remove dangerous inmates from the general population of other institutions and place them in the SMU.

50.     Inmates in the Lewisburg SMU program were confined to their cells for twenty-three hours per day.

51.     Inmates in the Lewisburg SMU received one hour of recreation per day, which was spent in an outdoor recreation cage.

52.     In July 2009, USP Lewisburg policy and the size of the cages permitted up to six inmates to be placed in a recreation cage simultaneously.

53.     Recreation cages were the only place where SMU inmates could physically interact with inmates other than their cellmates.

54.     In July 2009, USP Lewisburg policy and the size of the cages permitted up to six inmates to be placed in a recreation cage simultaneously.

Post Orders Requiring Supervision

55.     The BOP and individual correctional institutions draft and issue mandatory post orders that dictate the required job duties for each respective post or position at the institution.

56.     Post orders are mandatory, and corrections staff must follow the post orders of the institution and the post orders for their particular position.

57.     Following post orders is essential to the safe and effective operation of a prison facility.

58.     To help protect inmates and corrections staff in the dangerous climate of the SMU, the Z-Block Post Orders in effect on July 16, 2009, the day of the

stabbing, required officers to search and monitor inmates to help prevent the proliferation of weapons.

59.     In order to prevent inmates from using weapons to assault each other and staff, the Z-Block Post Order states under the Category of Inmate Movement/Escort:  "All inmates who are removed from the cell will be pat-searched and a hand-held metal detector utilized for screening."

60.     The Z-Block Post Orders also require that "a handheld metal detector will be used anytime an inmate is removed from his cell or the recreation areas."

61.     Corrections staff check to determine if the handheld metal detectors, known as "wands," are working properly every time the detectors are employed, including by checking the battery and making sure that the detector picks up metal items.

62.     These wands if used properly would detect a six to seven inch metal knife hidden on an inmate's person.

63.     Z-Block Post Orders also contain provisions designed to prevent armed assaults in recreation cages: "[a] staff member will remain in the recreation area anytime there is an inmate in a recreation cag, further, staff must "provide direct supervision during the times inmates are outside."

64.     These supervision requirements are in part designed to ensure that the inmates do not pass contraband, including knives, to each other.

65.     Accordingly, duties of the Recreation Officer involve watching the recreation cage and monitoring "suspicious" inmate activity such as inmates approaching the walls of the pen and passing contraband.

66.     According to the Post Orders, if the Recreation Officer spotted weapons or contraband being passed, the inmates could be strip searched to find the item.

67.     The Post Orders for the Z-Block Recreation Officer also required the recreation officer to sweep the cages and recreation area for contraband prior to recreation every day.

The DWB Assault on Wiggins on July 16, 2009

68.     On the morning of July 16, 2009, Mr. Wiggins was in cell number 307, on the third floor of Z-Block.

69.     The Lewisburg SMU documented prisoner recreation assignments via the "rec and shower schedule."  The officer creating the rec and shower schedule considers gang affiliations and separations.

70.     Ronnie Wiggins was not permitted to review the "rec and shower sheet" to learn who was in his recreation group before he went to the recreation cage on July 16, 2009.

71.     No one told Mr. Wiggins with whom he would be placed in a recreation cage on July 16, 2009, nor was Mr. Wiggins given the choice whether to attend recreation on July 16, 2009.

72.     Neither Mr. Wiggins nor his escorting officer could see who was in the recreation cage into which he was to be placed until Mr. Wiggins was placed in the sallyport of the cage.

73.     Mr. Wiggins was not permitted to choose his recreation group while he was on the third floor of Z-Block.

74.     Only two recreation cages were occupied when Mr. Wiggins was taken to recreation on July 16, 2009 – the rest remained empty.

75.     Mr. Wiggins had never personally met any of the four assailants, Wren, Layne, Martin, or Layton.

76.     Mr. Wiggins was the last inmate taken out to recreation on that day.

77.     Mr. Wiggins was placed in a recreation cage with four members of the DWB.

78.     One of the Hispanic inmates brought a 6.5-inch metal knife into an adjacent recreation cage.  One of the Hispanic inmates passed the metal knife to inmate Johnny Layne who was in the recreation cage with Mr. Wiggins.

79.    If the Hispanic inmate who brought the knife to the recreation cage had been searched or wanded properly, the 6.5 inch metal knife would have been discovered.

80.    Defendant Hornberger was assigned as the Z-Block recreation officer at the time that Ronnie Wiggins was stabbed.

81.    Defendant Hornberger failed to ensure that he or another staff member remained in the recreation area at the time of the attack on Mr. Wiggins.

82.    Neither Defendant Hornberger nor any other staff member remained in the recreation area while Mr. Wiggins was stabbed in the recreation cage on July 16, 2009.

83.    The escort officer walked away, and all four Dirty White Boys began a severe attack on Mr. Wiggins consisting of punches, kicks, and twenty-two separate stab wounds delivered by all four inmates, as they passed the knife around from one to the other.

84.    The Hispanic inmates were also housed on the third floor of Z-Block because all inmates on the same floor went to the recreation cages together.

85.    Mr. Wiggins suffered severe injuries from the attack.

86.    As a result of the attack, Mr. Wiggins needed immediate surgery in the hospital to address his injuries and spent seven days in the hospital.

87.    As a result of the attack and the surgery he underwent immediately after the attack, Mr. Wiggins developed incisional hernias.  Mr. Wiggins has undergone two unsuccessful surgeries to repair these hernias (one in 2011 and one in 2016).  These surgeries have not fixed Mr. Wiggins' hernias, and he continues to suffer an enormous amount of pain from his hernias.

88.    As a result of the attack and subsequent hernias, Mr. Wiggins has had substantial physical limitations which limit the movements he is able to make.  These physical limitations are likely to be permanent.

89.    Mr. Wiggins also suffered severe emotional distress as a result of the attack, and was diagnosed with PTSD while in prison.  He suffered severe anxiety, nightmares, and other psychological injuries in the years following the attack.

## PROPOSED CONCLUSIONS OF LAW (FTCA CLAIMS)

90.    Defendant was negligent in failing to follow the applicable Post Order and failing to use a metal detection wand on inmates being taken to Z-Block recreation cages on July 16, 2009

91.    Defendant's negligence was the direct and proximate cause of Mr. Wiggins's injuries.

\*     \*     \*     \*

Respectfully submitted,

/s/ Stephen D. Brown
Stephen D. Brown (PA 27829)
Thomas J. Miller (PA 316587)
Julia Chapman (PA 315959)
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Main:  (215) 994-4000
Fax:  (215) 994-2222
stephen.brown@dechert.com
thomas.miller@dechert.com
julia.chapman@dechert.com

Sean P. McConnell (PA 307740)
Duane Morris LLP
30 South 17th Street
Phone:  215-979-1947
Fax: 215-689-4586
spmconnell@duanemorris.com

*Counsel for Plaintiff Ronnie Wiggins*

## APPENDIX 1:  LIST OF EXHIBITS

**Case Caption:  Wiggins v. Bledsoe**          **Case No. 3:11-cv-1298**
**Middle District of Pennsylvania**          **Judge Munley**

| Def | PTF | Bates | Description of Object or Item | Identified | Evidence | Ruling | Witness on Stand |
|---|---|---|---|---|---|---|---|
| | PX-001 | D-0001 | BOP Health Services, Clinical Encounter (October 11, 2011) | | | | |
| | PX-002 | D-0035 | BOP Health Services Health Problems (multple dates) | | | | |
| | PX-003 | D-0051 | BOP Initial Assessment Form (June 8, 2011) | | | | |
| | PX-004 | D-0104 | BOP Health Services, Clinical Encounter (June 30, 2011) | | | | |
| | PX-005 | D-0121 | BOP Health Services, Clinical Encounter (June 8, 2011) | | | | |
| | PX-006 | D-0129 | BOP Health Services, Clinical Encounter (April 12, 2011) | | | | |
| | PX-007 | D-0183 | BOP Health Services, Clinical Encounter (July 26, 2010) | | | | |
| | PX-008 | D-0273 | Utilization Review Committee, USP Lewisburg Health Services (March 23, 2011) | | | | |
| | PX-009 | D-0295 | BOP Health Services, Clinical Encounter (June 9, 2010) | | | | |
| | PX-010 | D-0307 | BOP Health Services, Clinical Encounter (December 22, 2009) | | | | |

| PX-011 | D-0328 | BOP Health Services, Clinical Encounter (July 30, 2009) | | | | |
|---|---|---|---|---|---|---|
| PX-012 | D-0339 | BOP Health Services, Clinical Encounter (July 17, 2009) | | | | |
| PX-013 | D-0340 | BOP Health Services, Clinical Encounter (July 16, 2009) | | | | |
| PX-014 | D-0350 | Ronnie Wiggins, List of Medications (July 1, 2010) | | | | |
| PX-015 | D-0423 | Ronnie Wiggins Medical Evaluation (July 16, 2009) | | | | |
| PX-016 | D-0427 | Discharge Summary, Geisenger Medical Center (July 23, 2009) | | | | |
| PX-017 | D-0445 | Geisenger Medical Center Operative Report (July 16, 2009) | | | | |
| PX-018 | D-0520 | BOP Psychology Data System Evaluation (December 1, 2010) | | | | |
| PX-019 | D-0555 | Ronnie Wiggins Psychology Evaluation (June 11, 2009) | | | | |
| PX-020 | D-0679 | USP Lewisburg Escort Procedures | | | | |
| PX-021 | D-0713 | Bureau of Prisons Referral of an Inmate Criminal Matter, 7/16/2009 | | | | |
| PX-022 | D-0718 | Witness memos, Ronnie Wiggins Assault | | | | |
| PX-023 | D-0839 | Chain of Custody Log | | | | |
| PX-024 | D-0848 | Photos of the knife and recreation cage post assault | | | | |

| | PX-025 | D-0863 | Special Management Unit Inmate Handbook | | | | |
|---|---|---|---|---|---|---|---|
| | PX-026 | D-4338 | USP Lewisburg General Post Orders | | | | |
| | PX-027 | D-4378 | USP Lewisburg Special Management Unit, Special Post Orders, Z Block | | | | |
| | PX-028 | D-4433 | USP Lewisburg Post Orders, Z-Block Recreation Officer | | | | |
| | PX-029 | D-4938 | Photograph of Knife Used to Stab Ronnie Wiggins | | | | |
| | PX-030 | None | U.S. Dept. of Justice, Bureau of Prisons Program Statement: Special Management Units | | | | |
| | PX-031 | None | Video titled by BOP, "ASSAULT IN SHU REC 7-16-09_C-286 Z OUTSIDE REC #11…083036.avi | | | | |
| | PX-032 | None | Video Titled by BOP, "HANDING WEAPON FOR ASSAULT 7-16-09_C-287 Z OUTSIDE REC #12…082136.avi" | | | | |
| | PX-033 | None | USP Lewisburg Special Management Unit, Special Post Orders, Z Block (Bezy Report Exhibit D) | | | | |
| | PX-034 | None | Wiggins Current Patient Restrictions and EMR Medication Print Pass (January 19, 2018) [Provided to Defendants and Magistrate Judge during Mediation] | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| PX-035 | Med18 | BOP Health Services, Clinical Encounter (August 12, 2010) [Provided to Defendants and Magistrate Judge during Mediation] | | | | |
| PX-036 | Med20 | BOP Health Services, Clinical Encounter (September 6, 2010) [Provided to Defendants and Magistrate Judge during Mediation] | | | | |
| PX-037 | Med34 | St. Mary's of Scott County Consultation Report (November 8, 2011) [Provided to Defendants and Magistrate Judge during Mediation] | | | | |
| PX-038 | Med38 | Scott County Hospital Operative Report (December 13, 2011) [Provided to Defendants and Magistrate Judge during Mediation] | | | | |
| PX-039 | D-0585 | USP Lewisburg Institutional Supplement | | | | |
| PX-040 | None | Discipline statistics from USP Lewisburg for period August 2008 to December 2009 (Bezy Report Exhibit E) | | | | |
| PX-041 | None | Warden's Administrative Remedy responses (563782-F1; 545401-F1) (Bezy Report) | | | | |
| PX-042 | None | Individual Defendants' and United States of America's Responses to Plaintiff's First Request for Interrogatories Per Court Order | | | | |

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas J. Miller, do hereby certify that the foregoing was sent via the

Court's ECF filing system on August 28, 2018 to the following counsel of record:

        Timothy Judge, Esquire
        Assistant United States Attorney
        William J. Nealon Federal Building and Courthouse
        235 N. Washington Avenue
        P.O. Box 309
        Scranton, PA 18503
        Timothy.Judge@usdoj.gov

                        /s/ Thomas J. Miller
                        Thomas J. Miller